**SPRINT COMMUNICATIONS COMPANY, L.P.,**
Petitioner,

v.

**FEDERAL COMMUNICATIONS COMMISSION and the United States of America, Respondents,**

**AT & T Corporation, Intervenor.**

No. 94–1667.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 2, 1995.

Decided Feb. 23, 1996.

Donald E. Ward argued the cause for petitioner, with whom Leon M. Kestenbaum, Washington, DC, was on the briefs.

Laurel R. Bergold, Counsel, Federal Communications Commission, Washington, DC, argued the cause for respondents, with whom William E. Kennard, General Counsel, Daniel M. Armstrong, Associate General Counsel, and John E. Ingle, Deputy Associate General Counsel, Federal Communications Commission, and Anne K. Bingaman, Assistant Attorney General, Robert B. Nicholson and Robert J. Wiggers, Attorneys, U.S. Department of Justice, Washington, DC, were on the brief.

Peter D. Keisler, Washington, DC, argued the cause for intervenor, with whom Jonathan E. Nuechterlein, Washington, DC, Jules M. Perlberg, Chicago, IL, Mark C. Rosenblum, and Peter H. Jacoby, Basking Ridge, NJ, were on the brief.

Before: BUCKLEY, GINSBURG, and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In 1987 Sprint complained to the FCC that AT & T had been charging it unlawfully high rates for Digital Data Service. The Common Carrier Bureau dismissed Sprint's claim insofar as it related to damages suffered outside the two-year limitations period of 47 U.S.C. § 415—that is, damages suffered before January 1985. The Commission affirmed the Bureau's decision and Sprint petitioned this court for review.

Sprint argues first that AT & T should be denied the protection of the statute of limitations with respect to damages incurred before 1985 because, until November 12, 1985, AT & T fraudulently concealed the cost justification data upon which Sprint's claim is based. Fraud aside, Sprint argues in the

alternative that under the "discovery rule" the statute of limitations did not begin to run until November 12, 1985, when AT & T first publicly revealed and Sprint first discovered the information upon which the claim is based. Finally, Sprint objects to the FCC's refusal to permit discovery or conduct evidentiary proceedings with regard to the statute of limitations issues. As explained below, we affirm the FCC's decision in all respects.

## I. Background

Digital Data Service (DDS) is a private line communications service that AT & T first offered in 1974, pursuant to its Tariff 267. AT & T offered DDS at four different speeds, the highest of which was 56 kilobits per second (kbps).

From the outset the carrier proposed and sought to justify higher rates for the higher-speed versions of DDS. In 1977, after conducting an evidentiary hearing, the FCC held that the DDS rates in general were noncompensatory—that is, that the overall rate structure for DDS would yield too low a rate of return on AT & T's investment in the service. In addition, although it made no finding about the reasonableness of the rates for any particular DDS offering, the FCC did find that the progressively higher rates for higher speeds of service were not cost-justified because AT & T's own analysis demonstrated that there was little increase in cost to correspond with an increase in the speed of the service provided. The agency therefore directed AT & T to develop new, fully compensatory rates for DDS in accordance with the "fully distributed cost" methodology that the Commission had prescribed in Docket No. 18128, which established basic rate-making standards for AT & T's private line services. Until such new rates were in place, AT & T was permitted to adopt interim DDS rates that either were targeted to earn a 9.5% rate of return or conformed to the rate structure for AT & T's analog private line service. See AT & T, 62 F.C.C.2d 774 (1977), affd. sub nom. AT & T v. FCC, 602 F.2d 401 (D.C.Cir.1979).

Subsequently, AT & T submitted a revision of Tariff 267 in which it proposed interim DDS rates along the lines of its analog rates. The revised 56 kbps rates were five times the rates for the next-fastest DDS offering. Over the objections of customers who claimed that the 56 kbps rates were too high, the FCC nevertheless concluded that AT & T's method of calculating the 56 kbps rates was "not unreasonable for an interim period" and allowed them to go into effect. AT & T, 63 F.C.C.2d 936, 938 (1977).

In July 1977 AT & T filed another revision of its Tariff 267. In March 1978 the FCC rejected the DDS rates proposed in this revision because they did not conform with the specific requirements set out in the earlier DDS order and in Docket No. 18128. AT & T was given 90 days to tell the Commission when it would be able to file a fully justified DDS tariff that complied with all the relevant FCC orders. See AT & T, 67 F.C.C.2d 1195, 1231 (1978) (60 days); AT & T, 70 F.C.C.2d 616, 634 (1979) (30–day extension). AT & T then requested a meeting with the Common Carrier Bureau to discuss the particular requirements with which its rates would have to comply. AT & T claimed that it would be ready after that meeting to tell the FCC when it would file cost-justified rates. The meeting never took place.

In late 1979 the Commission held that AT & T's analog rates, upon which the interim DDS rates were based, were unjustifiable under the "fully distributed cost" methodology prescribed in Docket No. 18128. This decision was based in part upon the agency's finding that some DDS costs were being paid for by customers using other AT & T services. See AT & T, 74 F.C.C.2d 1 (1979). The Commission allowed the analog rates to remain in place, however, pending subsequent Commission action or a tariff revision.

In 1981, in the course of a rulemaking proceeding addressed to cost allocation issues, the Commission again found that the methodology AT & T used to justify its rates was inadequate and unreliable because certain private line services, including DDS, were not allocated their full cost burden. Consequently, the FCC directed AT & T to develop rates using the Interim Cost Allocation Manual (ICAM), which uses a cost methodology similar to that prescribed in Docket No. 18128. See AT & T, 84 F.C.C.2d 384,

403 (1981) [hereinafter *ICAM Order*], *affd. sub nom. MCI Telecomm. Corp. v. FCC*, 675 F.2d 408 (D.C.Cir.1982). Meanwhile, the interim DDS rate structure put into place in 1977 remained in effect until 1985, when AT & T restructured the rates for nearly all its private line services.

While the overall rate scheme for DDS remained the same, the rates themselves were raised incrementally each time the FCC increased AT & T's authorized rate of return. When the FCC increased the carrier's rate of return in 1981, it also considered and rejected various customers' arguments that AT & T's rates for 1.544 mbps and 56 kbps DDS earned an excessive rate of return. The Commission concluded that there was inadequate factual support for this contention, particularly in light of its earlier concerns that the DDS rates were unreasonably low. *AT & T*, 86 F.C.C.2d 689, 701 (1981).

Nonetheless, that November GTE Telenet Communications Corporation filed a complaint with the FCC alleging that AT & T's rates for 56 kbps DDS were indeed excessive. Telenet argued that the interim DDS rates, which the FCC had approved without cost-justification, had been in place for longer than a reasonable interim period. Moreover, Telenet pointed out, the FCC had since determined that the analog rates upon which AT & T's interim DDS rates were based were themselves inadequately cost-justified. Telenet also cited certain filings that AT & T had made with the Commission in 1978 and 1980 documenting that its earnings from 56 kbps DDS were roughly twice the carrier's then-authorized rate of return. In its answer to the Telenet complaint, AT & T denied that its rates were unlawful but admitted that in 1980 its rate of return on 56 kbps DDS was approximately 15%, or half-again its then-authorized rate of return.

In the course of investigating Telenet's complaint, the FCC staff asked AT & T to submit more cost-justification data and earnings information. Accordingly, on November 12, 1985 AT & T filed data showing that its actual rates of return on the 56 kbps service for 1979–81 and for 1983, and its projected rates of return for 1982–85, substantially exceeded its authorized rates of return for each of those years. *GTE Telenet Comm. Corp. v. AT & T*, File No. 81–32, Response of American Telephone & Telegraph Co., at tbl. A (Nov. 12, 1985).

In May 1986 the Common Carrier Bureau held that Telenet's complaint was barred by the two-year statute of limitations in 47 U.S.C. § 415 insofar as it related to damages suffered before November 1979. The Bureau also concluded that Telenet had failed to prove that AT & T's 56 kbps rates were unlawful during the period November 1979 to January 1982. With respect to Telenet's claims arising from later periods, the FCC held that AT & T must pay restitution. The parties then settled the case and the FCC dismissed the complaint and vacated the order.

In January 1987 Sprint likewise filed a complaint with the FCC seeking to recover damages suffered by a subsidiary (Uninet) that had paid AT & T's tariffed rates for 56 kbps DDS from 1982 to 1986. Sprint based this claim exclusively upon AT & T's November 12, 1985 report to the FCC. Sprint and AT & T reached a settlement with regard to the claims arising within the two-year limitations period, *see U.S. Sprint Comm. Co. v. AT & T*, 3 F.C.C.R. 6644 (Common Carrier Bureau 1988), and AT & T moved to dismiss the portion of the claim that sought damages suffered more than two years earlier. Sprint opposed on the ground that both the discovery rule and the doctrine of fraudulent concealment preclude AT & T's resort to the statute of limitations.

After consolidating Sprint's claim with those of several other DDS customers, the Common Carrier Bureau granted AT & T's motion to dismiss, concluding that Sprint and the other complainants had not carried their burden of proving with specific facts that AT & T had fraudulently concealed information material to their claims. The Bureau also concluded that Sprint and the other complainants knew or should have known that they had a claim no later than November 1981, when Telenet filed its claim based exclusively upon then-public information. *See Aetna Life Ins. Co. v. AT & T*, 3 F.C.C.R. 2126 (Common Carrier Bureau 1988). On appeal the Commission affirmed. *See U.S.*

*Sprint Comm. Co. v. AT & T,* 9 F.C.C.R. 4801 (1994).

## II.   Analysis

■ Under the statute of limitations in 47 U.S.C. § 415, Sprint had two years from the time its cause of action accrued within which to file its complaint.  When did its cause of action accrue?  In federal courts "the general rule of accrual" in cases in which the injury is "not of the sort that can readily be discovered when it occurs" is that a cause of action accrues and the limitations period begins to run only when "the plaintiff discovers, or with due diligence should have discovered, the injury that is the basis of the action." *Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336, 341–42 (D.C.Cir.1991).

■ If, however, the plaintiff did not discover the injury because the defendant fraudulently concealed material facts related to its wrongdoing, then the court will deem the cause of action not to have accrued during the period of such concealment—unless the defendant shows that the plaintiff would have discovered the fraud with the exercise of due diligence.  *Richards v. Mileski,* 662 F.2d 65, 71 (D.C.Cir.1981).  In order to carry that burden, the defendant must show that the plaintiff had "something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment."  *Riddell v. Riddell Washington Corp.,* 866 F.2d 1480, 1491 (D.C.Cir.1989).

Therefore, before turning to the question when Sprint's cause of action accrued, we shall review the FCC's decision that AT & T did not fraudulently conceal material information.  If the FCC is wrong about that, then we will deem the statute of limitations to have been tolled until Sprint had something approaching actual notice of its claim, and we will not need to determine when Sprint's claim would have accrued under the discovery rule.

■ But first a note on our standard of review.  In order to prevail, Sprint must show that the challenged agency decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  We may reverse only if the agency's decision is not supported by substantial evidence or the agency has made a clear error in judgment.  *Kisser v. Cisneros,* 14 F.3d 615, 618–19 (D.C.Cir.1994).

## A.   Fraudulent Concealment

■ In order to establish fraudulent concealment and hence to toll the running of the statute of limitations, the plaintiff must show that the defendant took "some misleading, deceptive or otherwise contrived action" to conceal information material to the plaintiff's claim.  *Hobson v. Wilson,* 737 F.2d 1, 34 (D.C.Cir.1984).  If the defendant's wrongs are not "self-concealing (such as frauds)," then the plaintiff must show that the defendant engaged in an act of concealment separate from the wrong itself.  *Id.* at 33; *Riddell,* 866 F.2d at 1491–92 (requiring some affirmative act or misrepresentation).  In either case the defendant's silence is not ordinarily enough.  *Wood v. Carpenter,* 101 U.S. 135, 143, 25 L.Ed. 807 (1879) ("There must be some trick or contrivance intended to exclude suspicion and prevent inquiry"), *quoted in Hobson,* 737 F.2d at 33.

■ Silence does toll the statute of limitations, however, if the defendant has an affirmative duty to disclose the relevant information to the plaintiff.  *See Smith v. Nixon,* 606 F.2d 1183, 1190 (D.C.Cir.1979); *see also Rutledge v. Boston Woven Hose & Rubber Co.,* 576 F.2d 248, 250 (9th Cir.1978).  That is, absent evidence to the contrary, the plaintiff is entitled to assume that the persons with whom he deals are not in default of their obligations to him.  Thus, in a case of medical malpractice, the statute of limitations is tolled if the doctor or hospital violates a fiduciary duty to disclose material information to the patient and, by extension, to the patient's legal representative after his death.  *See, e.g., Emmett v. Eastern Dispensary & Casualty Hosp.,* 396 F.2d 931, 936–38 n. 33 (D.C.Cir.1967) ("Where the relationship of the parties gives rise to a duty to reveal, nondisclosure of known facts, without artifice or design to bar access to the information, is 'fraudulent concealment' ").  Quite apart from any fiduciary relationship, the defen-

dant may be under a statutory duty to disclose the relevant information. In *Smith v. Nixon*, for example, we noted that the Government's breach of its statutory duty to disclose would toll the statute of limitations for a damage claim arising out of an unauthorized wiretapping. 606 F.2d at 1190.

Before the agency, Sprint argued that the doctrine of fraudulent concealment tolled the statute of limitations in this case until November 12, 1985, when AT & T first revealed to the FCC that its 56 kbps rates had been targeted to and actually did earn rates of return substantially in excess of the carrier's authorized rate of return. Sprint did not, however, point to any facts indicating, or make any argument to the effect, that AT & T's failure to disclose this information earlier was in violation of any duty, fiduciary or statutory, to disclose it. Rather, Sprint alleged merely that (i) "[t]wo Commission directives that AT & T advise it when it would be in a position to file such rates were effectively ignored"; (ii) AT & T had failed to establish cost-justified DDS rates, as required by the Commission's prior orders; (iii) the FCC had previously found AT & T's cost allocation methodology to be neither auditable nor understandable, thus rendering the Commission unable to prescribe cost-justified rates for AT & T; and (iv) AT & T had held out its rates as just and reasonable.

After considering this evidence, the Common Carrier Bureau held that Sprint had not satisfied its burden of "alleg[ing] facts showing affirmative conduct on the part of AT & T which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Aetna Life Ins. Co. v. AT & T*, 3 F.C.C.R. 2126, 2129 (1988). Instead, Sprint's allegations of fraud were limited to the wrongdoing itself—that is, AT & T's failure to file and to charge cost-justified rates. *Id.* at 2129 & n. 39 (citing *U.S. Cablevision v. New York Telephone Co.*, 46 F.C.C.2d 704, 707 (1974)). The Commission upheld the Bureau's decision on the same ground. *U.S. Sprint Comm. Co. v. AT & T*, 9 F.C.C.R. 4081, 4083–84 (1994).

On appeal, Sprint argues that AT & T had a duty to disclose reliable cost and revenue data to the FCC, and that its breach of that duty, which prevented Sprint from pursuing its right under 47 U.S.C. § 206 to recover the unlawfully high rates it paid, amounts to fraudulent concealment for the purpose of tolling the statute of limitations. In support of this claim, Sprint points to five instances of AT & T's failing to provide information: AT & T failed to (i) comply with the FCC's requirement that it file monthly reports of DDS revenues, expenses, and investments by rate element; (ii) submit the cost and investment information that the FCC would have needed to prescribe proper DDS rates; (iii) supply the required cost support for its replacement tariff in 1977; (iv) comply with the FCC's order that it tell the agency when it would be ready to file cost-justified rates; and (v) include cost-support data in its 1985 tariffs as required by the Commission's Rules.

Of the five allegations recited immediately above, however, Sprint put only one (the fourth) before the Commission. That was in keeping with the argument it made before the FCC, which was that AT & T had failed to propose cost-justified rates, not that AT & T had failed to disclose material information. It is true, as Sprint points out, that the factual basis for the argument that AT & T had a duty to disclose may be found in various FCC orders issued between 1975 and 1985, most of which the Bureau cited or discussed in the order it issued in this case. Sprint did not direct the agency's attention to that aspect of its prior decisions, however, nor did it advance the argument that those prior orders imposed upon AT & T a duty to disclose that it subsequently breached.

■ For this court to accept Sprint's argument that the FCC should have gleaned from its prior orders the facts relevant to Sprint's claim of fraudulent concealment would dramatically change judicial review of agency decisionmaking. The burden of uncovering and pointing to the facts relevant to the case before the agency would be shifted from the parties most concerned in the matter to the agency itself, at least insofar as those facts appear in the agency's related prior decisions. So drastic a departure from the adversarial system commends itself not at all to this court, which of necessity looks to the

Commission for the orderly administration of the Communications Act in the first instance. Our role is to review the agency's handling of the objections put before it, not to provide a forum for new arguments based upon different facts that the petitioner could have but did not bring out below. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 37, 73 S.Ct. 67, 69, 97 L.Ed. 54 (1952) ("Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice"); *Russian River Vintage Broadcasting v. FCC,* 5 F.3d 1518, 1521 (D.C.Cir.1993).

█ Based solely upon the evidence and arguments that Sprint presented to the FCC, the Commission correctly held that AT & T did not fraudulently conceal the facts upon which Sprint's claim is based. AT & T's wrongdoing lay in charging unlawfully high and unjustified rates. If AT & T for a time concealed this wrong by failing to disclose the expense and other cost-justification data required by the Commission, in breach of its duty to do so, Sprint never presented that allegation to the Commission. Instead, Sprint relied upon evidence that AT & T had failed to file authorized rates, had ignored directives requiring it to notify the Commission of when it would be ready to do so, and had used cost-allocation methodologies that the Commission found unsatisfactory. The agency concluded that this evidence was not sufficient to demonstrate fraudulent concealment, and we can see no error of judgment in that conclusion.

B. The Discovery Rule

█ Under the discovery rule, as we have said, a cause of action accrues when the injured party discovers—or in the exercise of due diligence should have discovered—that it has been injured. *MCI Telecomm. Corp. v. FCC,* 59 F.3d 1407 (D.C.Cir.1995); *Hobson,* 737 F.2d at 35 n. 107 (plaintiff "held to be on notice of all facts he could have learned through reasonably diligent inquiry"). Accrual does not wait until the injured party

has access to or constructive knowledge of all the facts required to support its claim. *United States v. Kubrick,* 444 U.S. 111, 123, 100 S.Ct. 352, 360, 62 L.Ed.2d 259 (1979). Nor is accrual deferred until the injured party has enough information to calculate its damages. Once the prospective plaintiff is on notice that it might have a claim, it is required to make a diligent inquiry into the facts and circumstances that would support that claim. *Cf. Riddell,* 866 F.2d at 1491 ("mere[ ] inquiry notice" would be "sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment"); *see also Hobson,* 737 F.2d at 35 & n. 107.

According to Sprint, it was not on inquiry notice of its possible claim until AT & T made the disclosure of November 12, 1985. The Commission, on the other hand, says that Sprint was on notice no later than 1981, when Telenet filed its complaint.

*1. Evidence of Inquiry Notice.* The Commission points to the following items of publicly available information that it says should, "either singly or in combination," have put Sprint on notice that it may have had a claim against AT & T. Sprint challenges the sufficiency of each and of all.

█ First is the series of orders in which the FCC held that the rates for AT & T's private line services, including DDS, were inadequately cost-justified. *See AT & T,* 62 F.C.C.2d 774 (1977), *affd. sub nom. AT & T v. FCC,* 602 F.2d 401 (D.C.Cir.1979) (DDS rates noncompensatory); *AT & T,* 74 F.C.C.2d 1 (1979) (analog private line rates, upon which AT & T based DDS rates, inadequately cost-justified); *ICAM Order,* 84 F.C.C.2d 384, 403 (1981) (rates for private line services, including DDS, noncompensatory), *affd. sub nom. MCI Telecomm. Corp. v. FCC,* 675 F.2d 408 (D.C.Cir.1982). Sprint argues that those decisions could not have put it on notice that the 56 kbps rates may have been too high because the decisions actually indicate that the DDS rates were, in the aggregate, too low. Nor, as Sprint points out, did the FCC in those decisions address the rates for any individual DDS offering. Consequently, we agree that insofar as the cited decisions held that AT & T's

rates were not cost-justified, they did not provide Sprint with inquiry notice that it had a claim against AT & T.

The Commission next suggests that the 1977 order and its sequelae put Sprint on notice insofar as the agency there rejected AT & T's initial rate structure in part because it proposed to charge higher rates for higher speeds of DDS: "AT & T's own analysis indicated little increase in cost with increase in speed." 62 F.C.C.2d at 792. Moreover, in the interim rate schedule that AT & T then proposed, the rates for 56 kbps DDS were five times the rates for the next-fastest DDS offering. When some customers objected, the FCC accepted the rates but only on the ground that they were "not unreasonable for an interim period." *AT & T,* 63 F.C.C.2d 936, 938 (1977). When the interim period had extended over a number of years, the passage of time alone may indeed have been enough to put AT & T's customers on notice that the rates could no longer be deemed reasonable.

Whether the passage of time was in fact enough for the Commission's objection to graduated rates, except on an interim basis, to ripen into inquiry notice is a question we need not resolve, however; for we are persuaded that Sprint was put on inquiry notice by unfolding events no later than was Telenet, which filed its complaint in 1981. The Telenet complaint cites the earnings data that AT & T submitted to the FCC in 1978 and 1980 for the various speeds of DDS. Those data showed that AT & T's earnings for 56 kbps DDS at that time substantially exceeded AT & T's then-authorized system-wide rate of return. Moreover, in its answer to the complaint AT & T admitted that in 1980 its rate of return for 56 kbps DDS was 15%, well in excess of the overall rate of return set by the FCC (9.5% to 10.5%).

Sprint denies the probative value of the Telenet complaint on three grounds. First, Sprint argues that the publicly available information in the complaint showed that AT & T had charged excessive rates in 1980, not during the 1982–85 period at issue in Sprint's complaint. Although this is certainly true, it does not prevent the information from serving as inquiry notice that AT & T might still be charging excessive rates in subsequent years. The "interim" rates—the rates that gave rise to the earnings data upon which Telenet relied—were in place from 1977 through 1985, and they were raised periodically to correspond with increases in AT & T's authorized rate of return. Barring any dramatic change in the cost of providing DDS, the logical inference had to be that the rates were probably excessive through 1985, when the entire rate structure was revamped.

Second, Sprint contends that the evidence relied upon by Telenet could not have put Sprint on notice of its claim because the data were produced using a cost methodology that was discredited in the 1981 ICAM order; indeed, Telenet's claim for damages incurred before 1981 was ultimately dismissed because the only data showing excessive earnings were based upon this discredited methodology. The ICAM Order, however, rejected AT & T's methodology because it resulted in an allocation of costs to DDS that was too low in the aggregate. The FCC concluded that neither the method that AT & T used nor the officially prescribed method provided sufficient information to allocate costs to individual services. *ICAM Order,* 84 F.C.C.2d 384, 395–96 (1981). That could not have given Sprint reason to conclude that AT & T's inordinately high rate of return for 56 kbps DDS in 1978 and 1980 was due entirely to an error in cost allocation; recall that the 56 kbps rate was five times the next-highest rate although the FCC had concluded earlier that there was little increase in cost associated with increasing the speed of DDS. Accordingly, the FCC could reasonably conclude that the 1978 and 1980 reports featured in Telenet's 1981 complaint put Sprint on inquiry notice of its possible claim notwithstanding the ICAM Order.

█ Third, Sprint argues that Telenet's complaint cannot constitute notice to Sprint because the claims in that complaint that relied upon the information publicly available at the time were dismissed for want of sufficient factual support. This argument rests upon a misunderstanding of the discovery rule. A claim accrues when the plaintiff has inquiry notice, not when the plaintiff has

easy access to all the information necessary to support a viable claim; once a plaintiff has such notice, it bears the responsibility of making diligent inquiries to uncover the remaining facts needed to support the claim. In filing its complaint Telenet asked the FCC to institute investigatory and ratemaking proceedings. Although the resulting investigation did not produce sufficient evidence to support Telenet's claim for 1979–80, it did produce sufficient evidence for 1982–85—the period for which Sprint seeks damages—and the FCC duly ordered AT & T to pay restitution to Telenet. In dismissing Sprint's claim, the FCC concluded that Sprint had the same notice as Telenet but, unlike Telenet, failed to act upon it. From our review of the record, we hold that this conclusion is supported by substantial evidence.

2. *Consistency with Precedent.* Further to its characterization of the discovery rule, Sprint contends that the Commission's decision in this case conflicts with its decisions in *MCI Telecommunications Corp. v. Pacific Northwest Bell,* 5 F.C.C.R. 216 (1989), and *AT & T v. Northwestern Bell,* 5 F.C.C.R. 143 (1989), both of which we affirmed recently in the consolidated case of *MCI Telecommunications Corp. v. FCC,* 59 F.3d 1407 (D.C.Cir. 1995). According to Sprint, the Commission, facing a situation similar to this one, in *MCI* concluded that the statute of limitations for a claim "for damages flowing from [LEC] over-earnings on interstate access services" began to run only after the carrier had filed its required final monitoring reports revealing that it had exceeded its prescribed rate of return. 5 F.C.C.R. at 3464. In this case, argues Sprint, the Commission rejected the analogous argument that Sprint's cause of action did not accrue until AT & T's November 12, 1985 filing.

The *MCI* case involved damage actions brought by interexchange carriers (IXCs) alleging that local exchange carriers (LECs) had charged them rates for interstate access services that caused the LECs to earn more than their then-authorized rates of return. The LECs were required to file preliminary earnings reports at the end of a prescribed monitoring period and final earnings reports nine months later. The issue was at which

stage the IXCs' cause of action accrued. We upheld the FCC's determination that the cause of action did not accrue until the final earnings reports were filed because "an IXC exercising due diligence" could not reasonably infer from the preliminary reports that it had been overcharged. 59 F.3d at 1417. Not only were the preliminary reports by design inconclusive, but they had in fact proved not even to be a reliable indicator of final results; therefore, no good purpose would be served if the claim were deemed to accrue before the final reports were available.

The FCC in this case distinguished *MCI* on the ground that here "AT & T was under no similar obligation to file reports showing its return levels on 56 kbps service. A prospective claimant was therefore required to discover sufficient information to establish a cause of action." *U.S. Sprint Comm. Co. v. AT & T,* 9 F.C.C.R. 4801, 4804 ¶ 17 (1994). Sprint retorts that AT & T was indeed required to file regular reports of its revenues, expenses, and investments but ceased doing so in 1980. Therefore, Sprint argues, its claim against AT & T accrued only when AT & T finally filed the data upon which the claim is based—in 1985.

We will assume, as Sprint asserts, that AT & T had and failed to satisfy an obligation to file regular reports. Any such reporting obligation, however, was, as the FCC put it, not "similar" to that of the LECs in *MCI.* In fact, the reports played quite different roles in the different regulatory regimes involved.

The FCC regulates interstate access services by prescribing a rate of return and then allowing the LECs to set their own rates at a level that will yield up to the allowed rate of return. *MCI,* 59 F.3d at 1409. If a periodic monitoring report reveals that an LEC earned a rate of return in excess of the allowed maximum, its IXC customers may file a claim for damages based entirely upon the excess of the rate actually earned over the prescribed rate of return; the claim does not arise until the IXC can make that ex post comparison. In contrast, the FCC regulates DDS by prescribing a rate of return and then requiring the carrier to file tariffs setting specific rates for the various DDS offer-

ings such that the projected revenues will yield the prescribed return to the carrier. The lawfulness of the rates is to be evaluated ex ante. Thus, Sprint could recover damages only by showing that the interim rates set by AT & T and allowed by the FCC were unlawful from the outset (putting aside the interim period for which they were not unreasonable). AT & T's periodic earnings reports, had it filed them, could have provided evidence that the carrier's rates were unlawful—at least enough to put Sprint on inquiry notice—but they were neither necessary nor sufficient to show that Sprint was entitled to recover.

Because of this fundamental distinction between the two regulatory regimes, the reports that the carriers under each scheme are required to submit must be treated differently for purposes of the discovery rule. Under the regulatory regime involved in *MCI*, a customer has no claim for over-earnings until the conclusion of the relevant monitoring period. Therefore, a customer in that regime cannot "discover" its possible claim until it can compare the prescribed rate of return with the rate of return actually earned during the monitoring period. Because the preliminary earnings reports are neither definitive nor reliable indicators of the actual rate of return, a customer is not on inquiry notice of its possible claim until the carrier files its final report. In this case, however, if the 56 kbps rates were unlawful at all, then they were unlawful from the outset, and Sprint's right to recover damages arose when the FCC allowed those rates to become (or remain) effective. Although Sprint might well have been put on inquiry notice of its claim earlier had AT & T timely filed the reports in question, the reports were only one of many potential sources of inquiry notice for Sprint. Once Sprint had such notice, from whatever source derived, it was under an obligation to inquire after the cost-justification information necessary to support its claim. The FCC's application of the discovery rule in *MCI* is therefore entirely consistent with its analysis here.

C. The FCC's Refusal To Investigate Further

Finally, Sprint objects to the FCC's failure to permit discovery or to conduct an evidentiary proceeding in order to investigate the alleged fraudulent concealment and other limitations issues. The Communications Act provides that "it shall be the duty of the Commission to investigate the matters complained of in such manner and by such means as it shall deem proper." 47 U.S.C. § 208(a). Notwithstanding the initial miscue given by the statutory reference to a "duty," therefore, it appears that the FCC's decision whether to investigate a particular matter is an "agency action ... committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). In any event, considering the gravamen of the fraudulent concealment claim as Sprint presented it to the FCC and the apparent irrelevance of discovery to the question when Sprint was on inquiry notice of its claim, *see* Parts II.A and B, *supra*, we cannot say that the Commission abused its discretion in declining to allow further factual development.

### III. Conclusion

The FCC's decision dismissing Sprint's claim is not arbitrary, capricious, or otherwise contrary to law. Sprint failed to carry its burden of showing that the statute of limitations was tolled due to fraudulent concealment on the part of AT & T, and there is substantial evidence that Sprint was on notice of its claims no later than November 1981. The two-year limitations period therefore ran out long before Sprint filed its complaint, and the statute now bars Sprint's claim for damages incurred before January 1985. Finally, even if the FCC's decision not to investigate further into the statute of limitations issues is reviewable, the Commission did not abuse its discretion. Accordingly, Sprint's petition for review is

*Denied.*