**Donald SCHMIDT et al.**

v.

**Kenneth DEVINO et al.**

**No. 3:99–CV–555(JGM).**

United States District Court,
D. Connecticut.

March 30, 2001.

James P. Brennan, Brennan & Isaac, Waterbury, CT, for Donald Schmidt, plaintiff.

James P. Brennan, (see above), for Robert P. Hanahan, plaintiff.

Frederick W. Krug, Matzkin, Krug & Danen, P.C., Waterbury, CT, for Kenneth Devino, defendant.

Frederick W. Krug, (see above), for Devino Fuels, Inc., defendant.

*MEMORANDUM OF DECISION*

MARGOLIS, United States Magistrate Judge.

On March 25, 1999, plaintiff Donald Schmidt ["Schmidt"] commenced this action against defendants Kenneth Devino ["Devino"] and Devino Fuels, Inc. ["Devino Fuels"] for an alleged wiretapping of plaintiff's workplace telephone. The complaint asserts four claims: violation of the Omnibus Crime Control Act of 1968, 18 U.S.C. § 2510 *et seq.* (First Cause of Action), violation of Conn.Gen.Stat. § 54–41r (Second Cause of Action), fraudulent concealment (Fourth Cause of Action),[1] and invasion of privacy (Fifth Cause of Action). On August 23, 1999, defendants filed their Answer and Affirmative Defenses (Dkt.# 17), denying the allegations of wiretapping and asserting three affirmative defenses: a two-year statute of limitation as to the First Cause of Action, a three-year statute of limitation as to the Second Cause of Action, and a three-year statute of limitation as to the Fourth Cause of Action. Plaintiff filed an Amended Complaint (Dkt.# 18) on August 24, 1999, adding Diane Dreskinis Schmidt, Lillian Schmidt, Eric Schmidt, and Robert P. Hanahan as plaintiffs. The parties consented to trial before this Magistrate Judge on July 2, 1999. (Dkt.# 13).

On February 8, 2000, defendants filed a Motion for Summary Judgment, which was denied on May 5, 2000, as to the claim that plaintiffs failed to commence suit within two years after the date they had reason-

---

1. A Third Cause of Action was not listed in the Complaint.

able opportunity to discover the wiretap, was granted against Diane Dreskinis Schmidt, Lillian Schmidt, and Eric Schmidt on the basis that these plaintiffs had not presented substantive evidence of wiretapping, and was denied with regard to defendants' arguments concerning Donald Schmidt and Robert Hanahan's state-law claims. *Schmidt v. Devino*, 106 F.Supp.2d 345 (D.Conn.2000).

On June 19, 2000, the parties filed their Joint Trial Memorandum (Dkt.# 40), which included a twenty-one paragraph Stipulation of Facts ["Stip."]. A bench trial was held on January 22–23, 2001, at which eight witnesses testified. (Dkts.## 44–47, 50–51). Both sides filed post-trial briefs on February 7, 2001. (Dkt.## 48–49). On February 21, 2001, plaintiffs filed their reply brief. (Dkt.# 52).[2]

For the reasons stated below, judgment shall enter as follows: with regard to the First Cause of Action, for plaintiff Schmidt for punitive damages only and for defendants in all other respects; with regard to the Second Cause of Action, for both plaintiffs; and with regard to the Fourth and Fifth Causes of Action, for defendants.

## I. FINDINGS OF FACT

The following constitutes the Court's findings of fact pursuant to FED.R.CIV.P. 52(a): Devino Fuels, Inc. is a Connecticut corporation located on Mattoon Road in Waterbury, Connecticut. (Stip. at ¶ 1; Exhs. 1–2A). Devino Fuels was owned by brothers Kenneth and Roger Devino. (Stip. at ¶ 2). Plaintiff Donald Schmidt, a close friend of Roger Devino, worked at Devino Fuels from November 1980 through April 19, 1996. (*Id.* at ¶¶ 3–4).

During the 1980's, Roger Devino actively ran Devino Fuels. (*Id.* at ¶ 5). Defendant Devino became involved in Devino Fuels in 1992 and then attended weekly meeting with Schmidt and Roger Devino. (*Id.* at ¶ 6). Defendant Devino criticized Schmidt in a manner which plaintiff regarded as highly unprofessional and dictatorial. (*Id.* at ¶ 7). As far back as the 1980's, Devino testified that he "found issue" with Schmidt's involvement in other pursuits (*i.e.*, politics) and watched these pursuits carefully. (Dkt. # 51, at 104). For medical reasons, Roger Devino stopped working at Devino Fuels on February 20, 1995. (Stip. at ¶¶ 8 & 12). Defendant Devino took over the active operation of Devino Fuels after February 20, 1995. (*Id.* at ¶ 13). From February 20, 1995, Schmidt's working relationship with Devino deteriorated until fourteen months later, in April 1996, Devino terminated Schmidt's employment at Devino Fuels. (*Id.* at ¶¶ 9 & 13). Schmidt acknowledged he had been actively involved in politics both before and during his employment at Devino Fuels. (Dkt. # 51, at 164–66, 184–86). Schmidt also acknowledged his problem with alcohol abuse from the late 1980's through April or May 1995. (*Id.* at 176–77).

Glen Duplissie ["Duplissie"] began working for Industrial Development Group ["IDG"] in 1983 as an independent contractor. (Dkt. # 50, at 25–26). In 1985 or 1986 Duplissie became an employee of IDG. (*Id.* at 26). While employed by IDG, Duplissie reported to Devino. (*Id.* at 28). Although at one time Duplissie held Devino in high regard, this is no longer true and there is now great animosity between the two men. (*Id.* at 161, 85–86).[3] Duplis-

**2.** Defendants waived their opportunity to file a reply brief. (Dkt.# 53)

**3.** Much of this animosity stems from allegations that Devino owes Duplissie approxi-

mately $120,000. (Dkt. # 50, at 145–46). According to Duplissie, he was due a yearly $10,000 bonus from IDG in addition to his salary; for many years Duplissie opted to leave the money in the business where it

sie and Schmidt have known each other since 1983 when Duplissie began working for IDG. (*Id.* at 32). IDG, Devino Fuels and Building Structures were owned by the same principals and operated out of the same building on Mattoon Road in Waterbury. (*Id.* at 28–29; Dkt. # 51, at 90–93).

Sometime during the latter half of 1992, in an attempt to prove to his brother Roger that Schmidt was involved in many inappropriate activities on company time and not serving the needs of the company, Devino asked Duplissie to install a recording device on Schmidt's office telephone, which Duplissie eventually agreed to do.[4] (Stip. at ¶ 10; Dkt. # 50, at 34–40, 101–04, 106–08, 111–13; Dkt. # 51, at 89–90, 107–08, 109–13). Duplissie purchased the necessary materials in cash at Radio Shack, obtained a key to Schmidt's office from defendant, and installed the equipment after all other employees had left the building for the evening. (Dkt. # 50, at 40–61, 108). Duplissie installed the device in such a manner that Schmidt would not know that his telephone conversations were being recorded. (*Id.* at 52–53). Duplissie retrieved tapes from the machine a few times, listened to them, and then turned all of the tapes, except one, over to Devino.[5] (*Id.* at 62–65). Duplissie then showed Devino how to retrieve the tapes and Duplissie did not retrieve any more tapes from the machine. (*Id.* at 65–67).

After showing Devino how to retrieve the tapes himself, Duplissie never saw Devino retrieve any other tapes. (*Id.* at 67–68). Although Duplissie never again saw Devino retrieve the tapes from the recording device, Duplissie believes that the recorder was used until late 1995 or early 1996, within six months of Schmidt's departure from Devino Fuels. (*Id.* at 70–74). Duplissie's memory of this time frame is

would receive ten percent interest. (*Id.* at 30–32). He received $8,000 in 1992 which he used towards the expenses of adopting his son. (*Id.* at 69, 81–82). Duplissie claims this was partial payment of his bonus, whereas Devino claims it was a business loan. (Dkt. # 51, at 123–27). It is evident to the court that Duplissie is biased against Devino and has called Devino "a dirt bag" (Exh. C), and a "piece of garbage." (Dkt. # 50, at 85–86; Dkt. # 51 at 152–54). In addition to these derogatory references, Duplissie has also reported Devino to the Internal Revenue Service and the Department of Environmental Protection. (Dkt. # 50, at 86, 90–92, 99).

Duplissie and Devino have been involved in litigation against one another over the bonus. (Dkt. # 50, at 81–82, 146–47; Dkt. # 51, at 16–17, 20, 123–24, 154; Exhs. 3 & A). Schmidt and Devino also have been involved against each other in litigation in state court, in which Schmidt was represented by Hanahan. (Dkt. # 51, at 63–64, 68–69, 70, 132–33, 174–75; Exh. 6).

In contrast, Duplissie agreed to cooperate with Schmidt in exchange for Schmidt's promise not to seek a prosecution against Duplissie. (Dkt. # 50, at 79–80, 161; Dkt. # 51, at 199–200; Exh. D).

4. Duplissie remembers that the recording device was installed prior to November 1992, the month in which he and his wife went out of state to adopt their son. (Dkt. # 50, at 39, 68, 101–04). Defendants do not disagree with this time frame. (Dkt. # 51, at 110).

5. The one tape not turned over to defendant was the "unclear" recording from the first night. (Dkt. # 50, at 137). Duplissie asserts that he put this tape, along with other tapes in which he surreptitiously recorded face-to-face conversations between himself and Devino, in a safe in his home. (*Id.* at 117–18, 137, 147–52). None of these tapes can now be located by Duplissie. (*Id.* at 119, 137, 147–52). The Court notes that even if this first tape could be found, it does not support the assertion that the recording device was left on Schmidt's office telephone until 1995 or 1996. The tape would, however, refute Devino's argument that the first tape was blank when Devino received it from Duplissie. (Dkt. # 51, at 116–18).

based on a bet he made with Gigi,[6] the secretary/bookkeeper of IDG and Building Structures, that Schmidt would be terminated within six months. (*Id.* at 139–41). Gigi was not called to testify as a witness and, therefore, did not corroborate Duplissie's testimony.

To support the claim that the recording device was operational through 1995 or 1996, Schmidt offered many "coincidences" where defendant seemed to know what Schmidt was discussing on the telephone. These coincidences included a 1993 or 1994 telephone conversation between Schmidt and the executive director of the Independent Connecticut Petroleum Association ["ICPA"], where the parties discussed a legislative issue involving taxing of motor fuel. (Stip. at ¶ 17; Dkt. # 51, at 182–83). Shortly thereafter, Devino told Schmidt that he wanted Schmidt less involved with ICPA. (Stip. at ¶ 17; Dkt. # 51, at 182–83). Another "coincidence" occurred in 1995, when Schmidt had a telephone conversation with a loan officer from Chase Manhattan Bank; within one week Devino approached Schmidt questioning whether Schmidt was trying to get money to start a business. (Dkt. # 51, at 183–84).

Devino asserts that the recording device was removed within a few weeks of its installation. (*Id.* at 127). In any event, both parties agree that a secretary was stationed outside of Schmidt's open office door and this secretary kept track of Schmidt's incoming and outgoing telephone calls. (Stip. at ¶ 21).

Ed Chrzanowski, an IDG employee responsible for maintenance, found the electronic device up on a girder in the ceiling in the garage area of the Mattoon Road business. (Dkt. # 50, at 4–5, 17–19; Exh. 1). The device was not visible from the ground, it had nothing plugged into it

when found, and Chrzanowski did not see a recording device connected to it. (Dkt. # 50, at 19–22). Chrzanowski was unable to recall exactly when he found the device but believed it was before Duplissie left his employment at IDG. (*Id.* at 22–23).

Duplissie left his employment with IDG in August 1997. (Dkt. # 50, at 25, 80). On January 28, 1998. Duplissie underwent rotator cuff surgery and for the next six months, until July 1998, he slipped in and out of consciousness. (*Id.* at 75–77, 144–45). It was during this period that Duplissie told Schmidt that a listening device had been installed on Schmidt's office telephone, although Duplissie has no recollection of this conversation with Schmidt. (Stip. at ¶ 14; Dkt. # 50, at 75, 77–78, 144; Dkt. # 51, at 179–80). Schmidt testified that he was taken back by Duplissie's disclosure, but did not doubt Duplissie; based on the "coincidences" discussed above, Schmidt had been suspicious during the 1990's that his conversations were being overheard. (Stip. at ¶¶ 15–16; Dkt. # 51, at 181–82). Based on these suspicions, Schmidt had suggested that his attorney and co-plaintiff in this action, Robert Hanahan, call him at home instead of at the office. (Stip. at ¶ 18). Schmidt also spoke on two occasions with a friend who owned a security firm in Waterbury to see if any equipment could detect whether his phone was "bugged." (Stip. at ¶ 15; Dkt. # 51, at 205). Schmidt decided not to pursue the matter at that time because his conviction was not strong enough to justify bringing in the equipment to "sweep" the office, nor did Schmidt still have a key to access the office after hours. (Dkt. # 51, at 205–07). Schmidt did, however, unscrew the mouthpiece of the telephone to see if there was a recording device. (*Id.* at

**6.** The transcripts erroneously refer to this employee as "G.G." The location of her office, with the proper spelling of her name, appears on Exhs. 2–2A.

205). Schmidt and Hanahan have never heard a recording or seen a transcript of these recorded conversations. (Stip. at ¶ 19; Dkt. # 51, at 181, 190–91, 84, 199).

## II. CONCLUSIONS OF LAW

The following constitutes the court's conclusions of law, pursuant to FED. R.CIV.P. 52(a):

### A. STATUTE OF LIMITATIONS

 Plaintiffs' suit is not barred by the statute of limitations. A civil action under 18 U.S.C. § 2520 "may not be commenced later than two years after the date upon which the claimant first had reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e). However, as in this case, where "the defendant took 'some misleading, deceptive or otherwise contrived action' to conceal information material to the plaintiff's claim," the running of the statute of limitations is tolled. *Sprint Communications Co., L.P. v. F.C.C.*, 76 F.3d 1221, 1226 (D.C.Cir.1996) (citation omitted). Where there has been fraudulent concealment, "the defendant must show that the plaintiff had 'something closer to actual notice than the merest inquiry notice that would be sufficient to set the statute of limitations running in a situation untainted by fraudulent concealment.'" *Id.* (citation omitted).

 Schmidt and Hanahan were suspicious of a wiretap in the 1990's but felt that Devino's coincidental knowledge of certain facts could be blamed on the secretary stationed outside Schmidt's office, who was instructed to keep track of Schmidt's calls. The fraudulent concealment doctrine, applicable to this case because the recording device was installed in a secretive manner to avoid detection, also argues for tolling the statute of limitations. Based on these circumstances, defendants have not shown that plaintiffs had notice akin to actual notice. Therefore, the running of the statute of limitations was tolled until March 1998, when Schmidt learned of the existence of the recording device from Duplissie.

### B. VIOLATION OF OMNIBUS CRIME CONTROL ACT OF 1968, 18 U.S.C. §§ 2510–20

18 U.S.C. § 2511(1)(a) ["Federal Wiretap Act"] provides that any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication" will be liable for damages. One who violates the Federal Wiretap Act is subject to the actual damages suffered by the plaintiff and any profits gained or statutory damages of $100 a day for each day the Act is violated or $10,000, whichever is greater. 18 U.S.C. § 2520(c)(2)(A)–(B). Punitive damages, reasonable attorney's fees and other litigation costs reasonably incurred may be recovered. 18 U.S.C. § 2520(b)(2)–(3).

### 1. STATUTORY DAMAGES

In this district as well as many others, courts have held that statutory damages pursuant to § 2520(c)(2)(B) are discretionary. *See Romano v. Terdik*, 939 F.Supp. 144, 146 (D.Conn.1996). *See also Nalley v. Nalley*, 53 F.3d 649, 651–53 (4th Cir.1995); *Goodspeed v. Harman*, 39 F.Supp.2d 787, 791 (N.D.Tex.1999); *Reynolds v. Spears*, 857 F.Supp. 1341, 1347–48 (W.D.Ark.1994), *aff'd*, 93 F.3d 428 (8th Cir.1996); *Shaver v. Shaver*, 799 F.Supp. 576, 579–80 (E.D.N.C. 1992). "However, the Court's discretion is limited to awarding the full amount of statutory damages or no damages at all." *Goodspeed*, 39 F.Supp.2d at 791 n. 6 (citation omitted). *See also In re State Police Litig.*, 5:89 CV 606(AHN), 1999 U.S.Dist. LEXIS 21491, at *14–15 (D.Conn.1999)

("assuming a violation was de minimis, the court has the discretion under Title III to award no damages for violations") (citations omitted); *Nalley*, 53 F.3d at 653–54 (court exercised discretion not to make any award of damages based on defendant's de minimis violation of the Act and where plaintiff did not suffer a financial loss and defendant did not profit); *Reynolds*, 857 F.Supp. at 1348 (finding that the court has discretion under the Federal Wiretap Act "to award either $10,000.00 damages or no damages."); *Shaver*, 799 F.Supp. at 580 ("the language of the statute does not allow the court to award any damages in an amount between these two choices").

Duplissie claims that the recording device was operational from 1992 through 1995 or 1996. Devino claims that it was never operational and was removed within a few weeks of installation. Although this Court finds neither witness particularly credible and indeed, "no one involved in this sordid tale has anything to brag about," *Arias v. Mutual Cent. Alarm Servs. Inc.*, 182 F.R.D. 407, 409 (S.D.N.Y. 1998), *aff'd*, 202 F.3d 553 (2d Cir.2000), the Court finds Devino's statement that the recording device was removed so quickly to be completely self-serving. Devino asks this Court to believe that he quickly gave up on the recorder when the tapes were "unclear" even though he was intent on getting rid of Schmidt by proving to his brother Roger that Schmidt was not serving the needs of the company. It is difficult to believe that after persuading Duplissie to install the device, Devino would so quickly abandon the scheme after three unsuccessful tapes.

 However, in spite of this, neither credible direct nor circumstantial evidence was presented to convince the Court that the recordings continued after 1992 (*i.e.*, from 1993 through early 1996). Just as the secretary stationed outside Schmidt's door supports Schmidt's argument that the coincidences were mere suspicions and could be reasonably blamed on secretarial intervention, this secretarial intervention also casts doubt on the contention that the recording device was operational for such an extended period. Duplissie's testimony, in light of his strong bias against Devino, does not strengthen plaintiffs' position as to when the recording device was removed. If plaintiffs had offered corroborating testimony from Gigi as to the bet made with Duplissie, Duplissie's testimony may have been more credible.

As noted in Section I. *supra*, Chrzanowski testified that he happened upon the electronic device on Mattoon Road prior to Duplissie's termination from IDG. However, Chrzanowski was unable to state the time frame in which he found the device. In any event, Chrzanowski testified that he did not see a recorder plugged into the device. Based on the information presented, the Court finds that plaintiffs have not proven that the recording device was operational after 1992.

The *Romano* court, after finding that statutory damages were not mandatory, found that the interceptions of plaintiffs' telephone calls by defendant were not de minimis: tape recorders were placed in the basement of plaintiffs' home, the recorders were connected to plaintiffs' telephone and into the bedrooms of plaintiff children, the recordings took place over a period of at least four years, defendant intercepted a total of forty-nine conversations on forty-nine separate days and defendant did not record the conversations for any understandable purpose such as to uncover a crime. 939 F.Supp. at 149–50. Based on these facts, the *Romano* court refused to define the interceptions as de minimis and each plaintiff was awarded statutory damages of $10,000. *Id.* at 150. Other factors considered by courts in de-

termining whether or not a violation is de minimis include whether there is actual financial loss to the plaintiff or profit to the defendant. *See Nalley*, 53 F.3d at 653–54. In assessing whether the plaintiff is entitled to any damages, the court should look at the "totality of facts and circumstances." *Shaver*, 799 F.Supp. at 580.

Although this Court concludes that there has been a violation of the Federal Wiretap Act by the defendants, the Court finds this violation de minimis: plaintiffs have not proven that the recording device was operational for an extended period of time, there was no proof that a substantial number of telephone conversations were intercepted, and one of Devino's purposes was to prove that Roger Devino's faith in Schmidt was misplaced. Accordingly, the Court awards no statutory damages to either plaintiff.

### 2. PUNITIVE DAMAGES

Punitive damages, however, are more appropriate under these circumstances. Punitive damages are traditionally designed to punish and deter and may exceed actual loss. *See Jacobson v. Rose*, 592 F.2d 515, 520 (9th Cir.1978), *cert. denied*, 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979). Punitive damages are warranted where plaintiff can prove "a wanton, reckless, or malicious violation." *Deal v. Spears*, 980 F.2d 1153, 1159 (8th Cir.1992) (citation omitted). Malicious is defined as "wrongful and done intentionally without just cause or excuse or as a result of ill will." BLACK'S LAW DICTIONARY 958 (6th ed.1991).

The *Deal* court found that punitive damages were not appropriate on the facts presented: defendants had lost $16,000 by theft which was described by the court as a serious blow to their business; plaintiff carried on frequent, lengthy, and inappropriate conversations while at work and in front of defendants' customers; and the court opined that the defendants were not taping plaintiff to get "dirt" on her but believed their business interests truly justified the recording. *Deal*, 980 F.2d at 1159.

■ In the case before this Court, and as noted earlier, the reason given for the wiretap was that Devino sought to prove to his brother Roger that his trust in Schmidt was unwarranted. Based on the testimony at trial, the Court finds that this is not the only reason for the wiretap. It is evident to the Court that Devino's business concerns were coupled with animosity directed towards Schmidt. In the late 1980's, when defendant Kenneth Devino became involved in Devino Fuels, Schmidt described Devino's management style towards him as "dictatorial" and "controlling." Devino, referring to a period in the early to mid–1980's and well before Devino's active involvement in Devino Fuels, admitted to "f[inding] issue" with Schmidt's involvement in other pursuits and watching these pursuits closely. After culling Schmidt's phone call box and noting calls from Schmidt's political connections, Devino instructed two receptionists to keep track of all Schmidt's calls, noting who called and whether or not the call was business related. It appears that Roger's protection of Schmidt was a source of irritation to Devino. Although Devino may have had legitimate business interests, there was clearly an air of bad feeling between Devino and Schmidt. In addition to protecting his business interests, Devino had the added bonus of humiliating Schmidt, a long-term employee of Devino Fuels. Accordingly, punitive damages are awarded to Schmidt in the amount of $2,500. Punitive damages are not appropriate for Hanahan.

## C. VIOLATION OF CONN.GEN. STAT. § 54–41R

The Connecticut Wiretapping and Electronic Surveillance Act [State Wiretap Act] provides that "[a]ny person whose wire communication is intercepted ... shall (1) have a civil cause of action against any person who intercepts, ... and (2) be entitled to recover from any such person actual damages but not less than liquidated damages computed at the rate of one hundred dollars per day for each day of violation or one thousand dollars, whichever is higher; punitive damages; and a reasonable attorney's fee and other litigation costs reasonably incurred." CONN.GEN. STAT. § 54–41r.

Plaintiffs claim entitlement to damages pursuant to the State Wiretap Act, relying on the same analysis as was utilized under 18 U.S.C. § 2510–20. Defendants counter that the plain language of CONN.GEN.STAT. § 54–41r requires proof that one or more of the plaintiff's conversations were "intercepted, disclosed, or used." Defendants argue that without such proof, judgment should enter for defendants.

It has been noted that the State Wiretap Act is to be interpreted similarly to the Federal Wiretap Act.[7] See In re State Police Litig., 888 F.Supp. 1235, 1269 (D.Conn.1995) (citations omitted), appeal dismissed, 88 F.3d 111 (2d Cir.1996); Crooker v. U.S. Dep't of Justice, 497 F.Supp. 500, 504 n. 5 (D.Conn.1980). In fact, the State Wiretap Act was patterned after the Federal Wiretap Act and thus the analysis for the federal statute is equally applicable to the Connecticut statute. See State Police Litig., 888 F.Supp.

at 1269 (citation omitted); Crooker, 497 F.Supp. at 504 n. 5.

■ As set forth in Section II.B.1. supra, the Court has concluded that Devino intercepted Schmidt's telephone calls some time during the latter half of 1992, the exact time frame still unknown. Therefore, defendants violated the State Wiretap Act and in accordance with CONN.GEN.STAT. § 54–41r, the Court awards $1,000 to plaintiff Schmidt and $1,000 to plaintiff Hanahan.

## D. STATE COMMON LAW CLAIM: INVASION OF PRIVACY

The four forms of invasion of privacy set forth in the Restatement (Second) of Torts are recognized by Connecticut. See State Police Litig., 888 F.Supp. at 1270 (citations omitted). The four actionable areas include: (1) intrusion upon the plaintiff's seclusion or private affairs; (2) disclosure of embarrassing private facts about the plaintiff; (3) publishing false derogatory statements about the plaintiff; and (4) commercial appropriation of the plaintiff's likeness. See Smith v. City of Hartford, 2000 WL 1058877 at *10 (Conn.Super. July 14, 2000) (citation omitted). Although plaintiffs do not assert the form of invasion of privacy relevant to this action, the Court finds that the only form applicable would be the intrusion upon Schmidt's seclusion or private affairs. The invasion of privacy by unreasonable intrusion upon the seclusion of another has been defined as:

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to

---

7. At least one court has found that CONN.GEN. STAT. § 54–41r pertains only to law enforcement officials. See Smith v. City of Hartford, 2000 WL 1058877, at *3 (Conn.Super. July 14, 2000). However, the statute defines "person" as "any officer, agent or employee of the state of Connecticut or any political subdivision thereof, and any individual, partnership, association, joint stock company, trust or corporation." CONN.GEN.STAT. § 54–41a(4). See Crooker v. U.S. Dep't of Justice, 497 F.Supp. 500, 504 n. 5 (D.Conn.1980).

the other for invasion of his privacy, if the intrusion would be highly offensive to a reasonable [person].

*State Police Litig.*, 888 F.Supp. at 1270 (citations omitted). In that decision, the court continued: "[i]t is persuasive that '[o]ne's seclusion may be as much disrupted by the presence of an electronic ear in a setting where one would normally expect to be alone as it is by the presence of a human ear in the same place.'" *See id.* (citation omitted). The Connecticut appellate courts have not yet interpreted what constitutes an invasion of privacy under a cause of action for intrusion upon one's seclusion or private affairs. *See Bonanno v. Dan Perkins Chevrolet*, 2000 WL 192182, 2000 Conn.Super. LEXIS 289, at *3 (Conn.Super. Feb. 4, 2000).

 Defendants argue that if the Court finds that conversations were recorded, then these recordings made by an employer during business hours merely to determine if the employee was using the telephone for unauthorized purposes do not meet the "highly offensive to a reasonable [person]" standard.

After reviewing the facts and testimony before this Court, Schmidt can hardly propose that his surroundings gave him any expectation of privacy. Schmidt was required to keep his office door open, and he believed the secretary stationed outside his door was listening to his calls and telling Devino the substance of his conversations. Although under normal circumstances a wiretap on an office telephone could be "highly offensive to a reasonable [person]," the circumstances on Mattoon Road were far from normal. For these reasons, judgment shall enter for defendants for invasion of privacy.

## III. CONCLUSION

Accordingly, for the reasons stated above, judgment shall enter as follows: with regard to the First Cause of Action, for plaintiff Schmidt in the amount of $2,500 for punitive damages only and for defendants in all other respects; with regard to the Second Cause of Action, for plaintiff Schmidt and plaintiff Hanahan in the amount of $1,000 each; and with regard to the Fourth and Fifth Causes of Action, for defendants.[8]

---

8. Plaintiffs shall file their motion for attorney's fees and costs, and brief and affidavit in support, *on or before April 20, 2001;* defendants shall file their brief in opposition *on or before May 11, 2001,* and plaintiffs may file a reply brief *on or before May 21, 2001.*