**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVEL COMMUNICATIONS, INC., a
Delaware corporation; ACCESS
ANYWHERE LLC; KRISTIN MOELLE;
AUTOMATED TELECOM TECHNOLOGY
INC., dba A-Tel Inc.; CENTRAL
TELEPHONE COMPANY; STEVE
PETERMAN, dba Colorado
Payphones; COMMUNICATIONS
MANAGEMENT SERVICES LLC,
       *Plaintiffs-Appellants,*

       v.

QWEST CORPORATION, a Colorado
corporation,
       *Defendant-Appellee.*

No. 04-35677

D.C. No.
CV-03-03680-MJP

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
December 8, 2005—Seattle, Washington

Filed June 26, 2006
Amended August 17, 2006

Before: Ronald M. Gould and Marsha S. Berzon,
Circuit Judges, and William W Schwarzer,* District Judge.

Opinion by Judge Berzon

---

*The Honorable William W Schwarzer, Senior United States District
Judge for the Northern District of California, sitting by designation.

9727

**COUNSEL**

Brooks E. Harlow, Miller Nash LLP, Seattle, Washington, for the plaintiffs-appellants.

Douglas P. Lobel and David A. Vogel, Arnold & Porter LLP, McLean, Virginia, for the defendant-appellee.

## ORDER

The opinion filed June 26, 2006, and published at 451 F.3d 1037, is withdrawn and superseded by the opinion filed concurrently herewith. The opinion is amended as follows:

1.  At slip op. 7048, first full paragraph, line 15, 451 F.3d at 1045-46, delete from the sentence beginning "That is to say . . ." through to the end of the paragraph.

2.  At slip op. 7049, 451 F.3d at 1046, delete from the paragraph beginning "Here, the FCC . . ." through to the end of Part II of the opinion, and insert the following:

"In *Reiter*, the Supreme Court held that the claim that a carrier's rates were not "reasonable," as required by Interstate Commerce Act, was not barred by the filed-rate doctrine. 507 U.S. at 266. Davel's complaint arises under §§ 201 and 276 of the 1996 Act. Section 201 is nearly identical to the provision of the Interstate Commerce Act at issue in *Reiter*, requiring telecommunications rates to be just and reasonable. Section 276 adds the further command that a carrier may not set its payphone rates so as to discriminate in favor of or subsidize its own payphone services, and instructs the agency to implement regulations requiring rates to meet the new services test. As in *Reiter*, these requirements, as well as the provision conferring on Davel a right of action for their enforcement, are accorded by the regulating statute which imposed the tariff filing requirement and are therefore not precluded by the filed rate doctrine.

"There is a related reason that the filed rate doctrine is inapplicable to the claims in this case. In *Transcon Lines*, the Supreme Court, following *Reiter*, held that a regulating agency may require a "departure from a filed rate when necessary to enforce other specific and valid regulations adopted under the Act, regulations that are consistent with the filed rate system and compatible with its effective operation." 513

U.S. at 147. Here, the FCC, in adopting the Waiver Order, expressly required a "departure from a filed rate" as to some non-compliant intrastate public access line tariffs. The Waiver Order extended the time for filing NST-compliant rates and provided that any existing non-compliant rates would remain on file in the interim. The Order further provided that once the NST-compliant rates became effective, carriers were to reimburse their customers for the difference between any newly compliant rates and any noncompliant rates on file after April 15, 1997. As the Order thus expressly provided that Qwest's customers might ultimately pay rates different from those on file during the waiver period for certain services obtained during that time,[4] it is not consistent with a strict application of the filed-rate doctrine to a challenge under the Waiver Order to assertedly non-compliant rates on file after April 15, 1997. Consequently, the filed-rate doctrine does not stand as a bar to construing the reach of and then enforcing the Waiver Order's reimbursement requirement in a case such as this one. This is so even though the lawsuit, in effect, challenges the tariffs on file between 1997 and 2002 and, if successful, would result in Davel paying an amount for public access line services different from that provided in those tariffs.[5]

"Accordingly, we hold that Davel's claims in this case are not barred by the filed-rate doctrine.[6]"

3.   At slip op. 7055, first full paragraph, line 12, 451 F.3d at 1049, change "consideration" to "argument".

---

[4]Qwest does not raise any challenge to the FCC's authority to promulgate such an order, and indeed, was part of the Coalition that requested it.

[5]By so holding, we do not decide whether the Waiver Order applies with respect to the particular rates challenged in this case or to any particular time period. As discussed below, the primary jurisdiction doctrine precludes us from determining the scope of the Waiver Order.

[6]The parties' arguments with regard to the fraud protection rates concern only the district court's statute of limitations decision. We therefore do not decide on this appeal whether the filed-rate doctrine is applicable to that claim.

4. At slip op. 7055, first full paragraph, lines 15-16, 451 F.3d at 1049, change "was not one contemplated" to "may not have been contemplated".

5. At slip op. 7055, last paragraph, line 2, 451 F.3d at 1049, change "the initial expectation" to "any initial expectation".

With these amendments, Qwest Corporation's petition for panel rehearing and motion for judicial notice are denied. No further petitions for rehearing or rehearing en banc will be entertained. *See* 9th Cir. G.O. 5.3(a).

---

# OPINION

BERZON, Circuit Judge:

The Federal Telecommunications Act of 1996 ("1996 Act") largely deregulated the telecommunications industry. At the same time, the 1996 Act continued to regulate certain segments of the industry so as to increase competition overall. For example, to promote more competitive market conditions, the 1996 Act required incumbent local exchange carriers, including appellee Qwest Corp., to provide access to their telephone lines and services essentially at their cost of providing the service.

In 1996 and 1997, the Federal Communications Commission ("FCC") issued a series of orders setting standards for rates and services offered by local carriers to payphone service providers. This case concerns claims by Davel Communications, Inc. and other payphone service providers ("Davel") that, under the FCC's 1996 and 1997 orders, Qwest owes reimbursements for periods in which it failed to file tariffs implementing the new standards or filed tariffs not compliant with the 1996 Act and its implementing regulations. The district court held the reimbursement claims barred by the

filed-tariff doctrine and dismissed them without prejudice. In addition, the court dismissed on statute of limitations grounds Davel's claims that Qwest overcharged it for fraud protection services during the time Qwest failed to file required fraud protection tariffs with the FCC.

As a threshold matter, Qwest contends that the district court lacked jurisdiction under the primary jurisdiction doctrine over Davel's claims and that we therefore lack jurisdiction to hear this appeal. That is not so. The primary jurisdiction doctrine is "a doctrine specifically applicable to claims *properly cognizable in court* that contain some issue within the special competence of an administrative agency." *Reiter v. Cooper*, 507 U.S. 258, 268 (1993) (emphasis added). In other words, "[p]rimary jurisdiction is not a doctrine that implicates the subject matter jurisdiction of the federal courts." *Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 780 (9th Cir. 2002). Consequently, even where the doctrine requires an issue to be referred to an administrative agency, it "does not deprive the court of jurisdiction." *Reiter*, 507 U.S. at 268.

We therefore have jurisdiction of this appeal from the final judgment of the district court pursuant to 28 U.S.C. § 1291, and address Qwest's primary jurisdiction doctrine contention on its merits in due course rather than as a threshold jurisdictional issue. *Cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (jurisdictional objections must be addressed before proceeding to merits issues). After considering the parties' contentions, we vacate the district court's order of dismissal and remand for further proceedings.

## I.   Background

Davel and the other appellants are payphone service providers that purchase telecommunications services from Qwest in eleven of the fourteen states in which Qwest operates. Because Qwest operates its own payphones, Davel is both a competitor and a customer of Qwest. The services Qwest pro-

vides its payphone service provider customers include public access lines, local usage to enable Davel to connect its payphones to the telephone network for placing calls, and fraud protection.

Chapter 5 of the Federal Communications Act of 1934 as amended by the 1996 Act regulates the telecommunications industry. 47 U.S.C. § 151 *et seq.*[1] As a general matter, the Federal Communications Act requires common carriers subject to its provisions to charge only just and reasonable rates, *id.* § 201, and to file their rates for their services with the FCC or, in some cases, with state agencies. *Id.* § 203. As part of the 1996 Act's general focus on improving the competitiveness of markets for telecommunications services, § 276 substantially modified the regulatory regime governing the payphone industry by providing, in general terms, that dominant carriers may not subsidize their payphone services from their other telecommunications operations and may not "prefer or discriminate in favor of [their] payphone service[s]" in the rates they charge to competitors. *Id.* § 276(a). The 1996 Act directs the FCC to issue regulations implementing these provisions, specifying in some detail the mandatory contents of the regulations. *Id.* § 276(b).

Pursuant to this directive, the FCC adopted regulations requiring local exchange carriers such as Qwest to set payphone service rates and "unbundled features" rates, including rates for fraud protection, according to the FCC's "new services test" (sometimes "NST"). The new services test requires that rates for those telecommunications services to which it applies be based on the actual cost of providing the service, plus a reasonable amount of the service provider's overhead costs. The FCC's regulations required local exchange carriers to develop rates for the use of public access lines by intrastate payphone service providers that were compliant with the new

---

[1]All statutory references are to the 2000 edition of Title 47 of the United States Code unless otherwise indicated.

services test. The rates were to be submitted to the utility commissions in the states in the local exchange carriers' territory, which would review and "file" (*i.e.*, approve) the rates. *See In re* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Report and Order*, FCC 96-388, 11 F.C.C.R. 20,541 (Sept. 20, 1996); *In re* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Order on Reconsideration*, FCC 96-439, 11 F.C.C.R. 21,233 (Nov. 8, 1996) ¶ 163 ("Order on Recons.") (collectively "Payphone Orders"). Also pursuant to the regulations, local exchange carriers were required to file their "unbundled features" rates with both the state commissions and the FCC for approval. Order on Recons. ¶ 163. The FCC required the local exchange carriers to file the new tariffs for both kinds of rates by January 15, 1997, with an effective date no later than April 15, 1997. *Id.*

In addition, the Payphone Orders required interexchange carriers, mainly long distance telephone service providers, to pay "dial-around compensation" to payphone service providers, including Qwest, for calls carried on the carrier's lines which originated from one of the provider's pay telephones.[2] If, however, the payphone service provider was also an incumbent local exchange carrier, as was Qwest, the Payphone Orders required full compliance with the new tariff filing requirements, including the filing of cost-based public access line rates and fraud protection rates, before the local

---

[2]Prior to the passage of the 1996 Act, callers could use an access number to bypass the payphone provider and place a call directly with the interexchange carrier. The interexchange carrier then collected the full tariff, leaving the payphone provider with no compensation for the call. Payphone providers were prohibited from blocking these calls. The new rules requiring dial-around compensation changed this regime so as to assure some compensation to the company that provided the payphone. *See* 47 U.S.C. § 276(b)(1)(A); *see generally Global Crossing Telecomm., Inc. v. FCC*, 259 F.3d 740, 742, 747 (D.C. Cir. 2001) (tracing background of the dial-around compensation regulations).

exchange carrier could begin collecting dial-around compensation.

On April 10, 1997, a coalition of regional Bell operating companies ("the Coalition"), which included Qwest, sent a letter to the FCC requesting a limited waiver of certain provisions of the Payphone Orders. The Coalition wanted this waiver so that the constituent companies could begin collecting dial-around compensation before they were in full compliance with the new regulations. Specifically, they requested an extension of time to file intrastate payphone service rates compliant with the new services test. These rates were due to become effective on April 15, 1997, but the Coalition wanted that deadline extended forty-five days from April 4, 1997. (The FCC had earlier granted a similar extension with respect to interstate rates.) The Coalition proposed that, if the FCC granted the waiver and allowed the Coalition companies to file rates that complied with the new services test by the extended deadline, those companies would reimburse or provide a credit back to April 15, 1997, to customers purchasing the services if the new rates were lower than the previous non-compliant rates.

On April 15, 1997, the FCC issued an order granting a limited waiver of the new services test rate-filing requirement. *In re* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Order*, DA 97-805, 12 F.C.C.R. 21,370 (Apr. 15, 1997) ("Waiver Order"). Specifically, the Waiver Order granted an extension until May 19, 1997, for filing intrastate payphone service rates compliant with the new services test, while at the same time permitting incumbent local exchange carriers to begin collecting dial-around compensation as of April 15, 1997. *Id.* ¶ 2. The Waiver Order stated that the existing rates would continue in effect from April 15, 1997, until the new, compliant rates became effective ("the waiver period"). The NST-compliant rates were to be filed with state utility commissions, which were required to act on the filed rates "within

a reasonable time." *Id.* ¶ 19 n.60; *see also id.* ¶¶ 2, 18-19, 25. If a local exchange carrier relied on the waiver, it was required to reimburse its customers "from April 15, 1997 in situations where the newly [filed] rates, when effective, are lower than the existing [filed] rates." *Id.* ¶¶ 2, 20, 25. The order emphasized that the waiver was "limited" and "of brief duration." *Id.* ¶¶ 21, 23.

In 2002, in a decision subsequently affirmed by the D.C. Circuit, the FCC clarified the requirements of the new services test as it applies to the payphone industry, making it clear that, as in other areas in which it has been applied, the new services test requires forward looking, cost-based rates. *In re* Wis. Pub. Serv. Comm'n, *Mem. Op. & Order,* 17 F.C.C.R. 2051 (2002) ("Wisconsin Order"), *aff'd New Eng. Pub. Commc'ns Council, Inc. v. FCC*, 334 F.3d 69 (D.C. Cir. 2003). That is, the rates must take into account only the ongoing costs of providing the service, and may not recover previously incurred costs, such as those incurred in building the telephone system infrastructure. In so holding, the FCC rejected the Coalition's challenge to its authority to regulate intrastate rates and to require forward-looking cost estimates in determining rates, as well as the Coalition's challenges to the agency's determination of how overhead costs may be allocated. *Id.* ¶¶ 31-58. In 2002, after the FCC's decision in the Wisconsin Order, Qwest dramatically reduced its public access line and fraud protection tariffs.

Davel maintains that the rates Qwest charged for public access lines services from 1997 to 2002 did not comply with the new services test. Because Qwest relied on the Waiver Order by collecting dial-around compensation beginning on April 15, 1997, argues Davel, Qwest is required by the Act itself and by the Waiver Order to refund the difference between the non-compliant rates charged from 1997 to 2002 and the compliant rates filed in 2002.

Davel further contends that: (1) from 1997 to 2002, rather than filing NST-compliant public access line rates in any of

eleven states in which the plaintiff payphone service providers operate, Qwest was pursuing legal challenges to the FCC's authority to regulate intrastate public access line rates; (2) the first time Qwest filed NST-compliant rates in the states at issue was in 2002; (3) the rates filed in 2002, which were substantially lower than the 1997-2002 rates, show that Qwest's 1997-2002 rates were not compliant with the new services test. On these premises, Davel argues that the Waiver Order requires Qwest to reimburse it for the difference between the compliant rate filed in 2002 and the non-compliant rates actually charged for the entire preceding period, beginning on April 15, 1997.

In addition, according to Davel, Qwest was required pursuant to the Order on Recons. to file with the FCC rates compliant with the new services test for fraud protection services and other "unbundled features." Davel alleges that Qwest failed to file compliant fraud protection rates from 1997 until 2002 or 2003, and that this lapse violated the Act. Pursuant to 47 U.S.C. §§ 206-207, Davel asserts, it is entitled to recover damages for this violation measured by the difference between the amount it was charged and the compliant rates.

Qwest moved to dismiss Davel's complaint under Federal Rule of Civil Procedure 12(b)(6), arguing (1) that Davel's claims arising out of the payphone service rates are barred by the filed-rate doctrine; and (2) that Davel's claim arising from the fraud protection rates is time-barred under the applicable statute of limitations. In the alternative, Qwest, invoking the primary jurisdiction doctrine, requested a stay and referral of the threshold legal issues to the appropriate state and federal agencies. The district court granted Qwest's motion to dismiss, holding Davel's refund claims under the Waiver Order barred by the filed-rate doctrine and its fraud protection claims barred by the two year statute of limitations set out in 47 U.S.C. § 415. The court dismissed Davel's complaint without prejudice to Davel's asserting the claims before the appropriate administrative tribunals. We review de novo the district

court's dismissal for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Madison v. Graham*, 316 F.3d 867, 869 (9th Cir. 2002).

## II.   The Filed-Rate Doctrine

**[1]** The filed-rate doctrine, also known as the filed-tariff doctrine, applies in regulated industries in which federal law requires common carriers publicly to file schedules of services and the rates or tariffs to be charged for those services. The doctrine requires that common carriers and their customers adhere to tariffs filed and approved by appropriate regulatory agencies. *Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). "Under the doctrine, once a carrier's tariff is approved by the FCC [or an appropriate state agency], the terms of the federal tariff are considered to be 'the law' and to therefore 'conclusively and exclusively enumerate the rights and liabilities' as between the carrier and the customer." *Id.* (quoting *Marcus v. AT&T Corp.*, 138 F.3d 46, 56 (2d Cir. 1998)).

> Not only is a carrier forbidden from charging rates other than as set out in its filed tariff, but customers are also charged with notice of the terms and rates set out in that filed tariff and may not bring an action against a carrier that would invalidate, alter or add to the terms of the filed tariff.

*Id.* (citations omitted). That is, the doctrine bars suits challenging rates which "if successful, would have the effect of changing the filed tariff." *Brown v. MCI WorldCom Network Servs., Inc.*, 277 F.3d 1166, 1170 (9th Cir. 2002).

The regulatory scheme of the Federal Communications Act, the source since 1934 of the filed-rate doctrine in the telecommunications industry, *see Evanns*, 229 F.3d at 840, was fundamentally altered with the passage of the 1996 Act. Although the Federal Communications Act prohibited the

FCC from eliminating for any covered carriers the require-ment that they obtain advance approval of schedules of rates from the agency and adhere to the approved tariffs, *see Ting v. AT&T*, 319 F.3d 1126, 1131-32 (9th Cir. 2003) (citing *MCI Telecomms. Corp. v. AT&T Corp.*, 512 U.S. 218, 231 (1994)), the 1996 Act expressly permitted the FCC to "detariff" (to use the telecommunications industry's "horrid neologism," *Verizon Del., Inc. v. Covad Commc'ns Co.*, 377 F.3d 1081, 1089 (9th Cir. 2004)) large swaths of the telecommunications industry. 47 U.S.C. § 160(a); *see Ting*, 319 F.3d at 1132. Where the FCC has done so, the filed-rate doctrine no longer applies. *See Verizon Del.*, 377 F.3d at 1088. Conversely, where tariff filing is still required by statute or regulation, the filed-rate doctrine continues to apply with full force. *Id.* at 1089.

**[2]** In its regulations implementing the requirements of § 276, the FCC chose to require filing of tariffs for certain aspects of the payphone system while leaving others to the free market. *See* Order on Recons. With respect to the public access line rates at issue here, the FCC indisputably imposed a rate-filing requirement. *See id.* ¶ 163. The Commission similarly imposed a tariffing requirement with respect to fraud protection rates. *Id.* Intrastate public access line tariffs are to be filed with state regulatory agencies, while rates for unbundled services, including fraud protection, are to be filed with both the state agencies and the FCC. *Id.* Thus, while Davel may be correct as a general matter that "the filed-rate doctrine is all but dead in telecommunications law," the "but" qualifier applies here, as the doctrine is not dead with respect the rates at issue in this case.

**[3]** Nevertheless, the filed-tariff doctrine does not bar a suit to enforce a command of the very regulatory statute giving rise to the tariff-filing requirement, even where the effect of enforcement would be to change the filed tariff. *Reiter*, 507 U.S. at 266 (holding, in a motor carrier case, that the filed-rate doctrine applies to common-law claims but "assuredly does

*not* preclude avoidance of the tariff rate . . . through claims and defenses that are specifically accorded by the [Interstate Commerce Act] itself").**³** This principle applies to regulations implementing the statutory command as well as to the statute itself. *See ICC v. Transcon Lines*, 513 U.S. 138, 147 (1995) ("Carriers must comply with the comprehensive scheme provided by the statute and regulations promulgated under it, and their failure to do so may justify departure from the filed rate.").

**[4]** In *Reiter*, the Supreme Court held that the claim that a carrier's rates were not "reasonable," as required by Interstate Commerce Act, was not barred by the filed-rate doctrine. 507 U.S. at 266. Davel's complaint arises under §§ 201 and 276 of the 1996 Act. Section 201 is nearly identical to the provision of the Interstate Commerce Act at issue in *Reiter*, requiring telecommunications rates to be just and reasonable. Section 276 adds the further command that a carrier may not set its payphone rates so as to discriminate in favor of or subsidize its own payphone services, and instructs the agency to implement regulations requiring rates to meet the new services test. As in *Reiter*, these requirements, as well as the provision conferring on Davel a right of action for their enforcement, are accorded by the regulating statute which imposed the tariff filing requirement and are therefore not precluded by the filed rate doctrine.

---

**³**We note that the question whether the 1996 Act provides a private right of action to enforce payphone regulations such as the Waiver Order is pending before the United States Supreme Court. *See Metrophones Telecomms., Inc. v. Global Crossing Telecomms., Inc.*, 423 F.3d 1056, 1065-70 (9th Cir. 2005), *cert. granted* 126 S. Ct. 1329 (Feb. 21, 2006). However, as Qwest emphatically stated in its October 3, 2005, Fed. R. App. P. 28(j) letter, it has never disputed in this case that Davel has such a right of action. We therefore decline to address the issue, assuming for purposes of this case only that Davel does have a right of action. *See Burks v. Lasker*, 441 U.S. 471, 475-76 & n.5 (1979) (the existence of a private right of action is not a jurisdictional question, and, where not raised, may be assumed without being decided).

**[5]** There is a related reason that the filed rate doctrine is inapplicable to the claims in this case. In *Transcon Lines*, the Supreme Court, following *Reiter*, held that a regulating agency may require a "departure from a filed rate when necessary to enforce other specific and valid regulations adopted under the Act, regulations that are consistent with the filed rate system and compatible with its effective operation." 513 U.S. at 147. Here, the FCC, in adopting the Waiver Order, expressly required a "departure from a filed rate" as to some non-compliant intrastate public access line tariffs. The Waiver Order extended the time for filing NST-compliant rates and provided that any existing non-compliant rates would remain on file in the interim. The Order further provided that once the NST-compliant rates became effective, carriers were to reimburse their customers for the difference between any newly compliant rates and any noncompliant rates on file after April 15, 1997. As the Order thus expressly provided that Qwest's customers might ultimately pay rates different from those on file during the waiver period for certain services obtained during that time,[4] it is not consistent with a strict application of the filed-rate doctrine to a challenge under the Waiver Order to assertedly non-compliant rates on file after April 15, 1997. Consequently, the filed-rate doctrine does not stand as a bar to construing the reach of and then enforcing the Waiver Order's reimbursement requirement in a case such as this one. This is so even though the lawsuit, in effect, challenges the tariffs on file between 1997 and 2002 and, if successful, would result in Davel paying an amount for public access line services different from that provided in those tariffs.[5]

---

[4]Qwest does not raise any challenge to the FCC's authority to promulgate such an order, and indeed, was part of the Coalition that requested it.

[5]By so holding, we do not decide whether the Waiver Order applies with respect to the particular rates challenged in this case or to any particular time period. As discussed below, the primary jurisdiction doctrine precludes us from determining the scope of the Waiver Order.

**[6]** Accordingly, we hold that Davel's claims in this case are not barred by the filed-rate doctrine.[6]

## III. The Primary Jurisdiction Doctrine

The conclusion that the filed-rate doctrine does not preclude Davel's lawsuit does not mean that the case can go forward. Davel's refund claim presents several issues that arguably implicate technical and policy considerations. Qwest contends that under the primary jurisdiction doctrine, these issues must be addressed in the first instance by the agencies with regulatory authority over the payphone industry.

**[7]** The doctrine of primary jurisdiction "is a prudential doctrine under which courts may, under appropriate circumstances, determine that the initial decisionmaking responsibility should be performed by the relevant agency rather than the courts." *Syntek*, 307 F.3d at 780. "The doctrine is applicable whenever the enforcement of a claim subject to a specific regulatory scheme requires resolution of issues that are 'within the special competence of an administrative body.' " *Farley Transp. Co. v. Santa Fe Trail Transp. Co.*, 778 F.2d 1365, 1370 (9th Cir. 1985) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63 (1956)). The doctrine does not, however, "require that all claims within an agency's purview be decided by the agency." *Brown*, 277 F.3d at 1172; *accord United States v. Gen. Dynamics Corp.*, 828 F.2d 1356, 1363 (9th Cir. 1987) ("While it is certainly true that the competence of an agency to pass on an issue is a necessary condition to the application of the doctrine, competence alone is not sufficient."). "Nor is [the primary jurisdiction doctrine] intended to 'secure expert advice' for the courts from regulatory agencies every time a court is presented with an issue conceivably within the agency's ambit." *Brown*, 277 F.3d at 1172.

---

[6]The parties' arguments with regard to the fraud protection rates concern only the district court's statute of limitations decision. We therefore do not decide on this appeal whether the filed-rate doctrine is applicable to that claim.

**[8]** Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," *W. Pac.*, 352 U.S. at 64, courts in this circuit traditionally look for four factors identified in *General Dynamics*. Under this test, the doctrine applies where there is "(1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." *Gen. Dynamics*, 828 F.2d at 1362.

Where an issue falls within an agency's primary jurisdiction, the district court enables "referral" of the issue to the agency. *Reiter*, 507 U.S. at 268. As we have explained,

> "Referral" is the term of art employed in primary jurisdiction cases. In practice, it means that a court either stays proceedings, or dismisses the case without prejudice, so that the parties may pursue their administrative remedies. There is no formal transfer mechanism between the courts and the agency; rather, upon invocation of the primary jurisdiction doctrine, the parties are responsible for initiating the appropriate proceedings before the agency.

*Syntek*, 307 F.3d at 782 n.3 (citations omitted).

Qwest argues that the primary jurisdiction doctrine requires "referral" of two issues necessary to the resolution of this case: First, Qwest contends that, to assure uniformity of administration, the FCC, rather than the court, should resolve the parties' dispute as to the scope of the Waiver Order—that is, whether, as Qwest would have it, the refund obligation was limited to the forty-five-day period in which Qwest was to bring its public access line rates into compliance with the new services test, or whether, as Davel asserts, the obligation was open-ended, continuing until Qwest filed rates which were in fact compliant. Second, Qwest argues, whether Davel is enti-

tled to any refund depends on whether the public access line rates Qwest filed prior to 2002 were in fact not compliant with the new services test, as Davel alleges. Qwest maintains that this determination will require a highly technical application of the new services test, a task within the primary jurisdiction of the state utility commissions and the FCC.

## A.

Relying on *Cost Management Services, Inc. v. Washington Natural Gas Co.*, 99 F.3d 937, 948-49 (9th Cir 1996), Davel asserts as an initial matter that the primary jurisdiction doctrine does not apply at this juncture—that is, when a case is at the motion to dismiss stage. Davel maintains that it has adequately alleged that the public access line rates Qwest filed prior to 2002 were not cost-based, so the threshold issue of whether the rates were consistent with the new services test must be resolved in Davel's favor, and it is therefore entitled to go forward with its case. Qwest, in contrast, maintains that the proper interpretation of an agency order, here the Waiver Order, is an issue which must be decided by the agency, regardless of the plaintiffs' factual allegations.[7]

In *Cost Management*, the plaintiff claimed that the owner of the natural gas delivery facilities violated its own filed tariff in an effort to monopolize the local natural gas market, in violation of the Sherman Antitrust Act. *Id.* at 940-41. The defendant sought dismissal on the ground, among others, that the issue whether it had violated the tariff was within the primary jurisdiction of the state utility commission. *Id.* at 941, 948-49. We held the primary jurisdiction doctrine inapplicable on the grounds that the facts alleged in the complaint established a violation of the tariff, and thus, on a 12(b)(6)

---

[7]Qwest additionally contends that the issue of its rates' compliance with the new services test may be referred on a motion to dismiss. Because we conclude that referral of the proper construction of the Waiver Order is required, we do not address this contention.

motion, the issue to be referred "must necessarily be resolved in favor of [the plaintiff]." *Id.* at 949. Implicit in this conclusion was the recognition that resolving the question whether there was a violation of an applicable tariff did not necessarily involve complex issues requiring agency expertise. *Cf. W. Pac.*, 352 U.S. at 69; *Brown*, 277 F.3d at 1173.

**[9]** Reading *Cost Management* against the background of established Rule 12(b)(6) jurisprudence, it becomes clear that *Cost Management*'s primary jurisdiction holding was but a straightforward application in the context of the primary jurisdiction doctrine of standard principles of pleading applicable to any motion to dismiss. Under these principles, "the federal courts may not dismiss a complaint unless 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Kwai Fun Wong v. United States*, 373 F.3d 952, 956-57 (9th Cir. 2004) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

**[10]** In the context of the primary jurisdiction doctrine, the analogous question is whether any set of facts could be proved which would avoid application of the doctrine. The superordinate question governing the primary jurisdiction doctrine is "whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *W. Pac.*, 352 U.S. at 64. Whether this question can be answered on a motion to dismiss depends on the nature of the case.

**[11]** Where the issues raised by a complaint necessarily implicate policy concerns requiring application of the primary jurisdiction doctrine, a federal court may suspend its resolution of those issues in favor of their referral to the governing agency. *Cost Management* by contrast did not *necessarily* involve policy concerns committed to an agency, and our decision there simply conforms the primary jurisdiction doctrine with the usual principles that apply on motions to dismiss. In other words, where, as in *Cost Management*, the

allegations of the complaint do not necessarily require the doctrine's applicability, then the primary jurisdiction doctrine may not be applied on a motion to dismiss; if, on the other hand, the primary jurisdiction doctrine applies on any set of facts that could be developed by the parties, there is no reason to await discovery, summary judgment, or trial, and the application of the doctrine properly may be determined on the pleadings. The Waiver Order construction issue in this case, as will appear, is of the latter variety.

## B.

The threshold dispute regarding the refund claim centers on whether the Waiver Order entitles Davel to the refund, assuming the facts Davel has alleged. Specifically, the parties dispute whether the Waiver Order's reimbursement requirement is limited to the forty-five-day period of the Order's waiver of the rate filing deadline, or whether the reimbursement obligation instead extends indefinitely—that is, until Qwest's NST-compliant rates are on file and effective. Davel contends that the plain language of the Waiver Order provides for an open-ended obligation. Qwest maintains, in contrast, that the waiver provided by the order was expressly limited to a forty-five-day period, and that it would be absurd to construe the reimbursement obligation as extending beyond that period. Qwest further contends that if, as Davel alleges, it failed to file NST-compliant rates at all during the forty-five-day extension provided by the Waiver Order, then the Order's refund obligation never arose, and Davel's only remedy was a reparations claim filed with the FCC at the time of the missed deadline. Finally, Qwest argues, this threshold dispute over the scope and construction of the Waiver Order must be referred to the FCC under the primary jurisdiction doctrine.

**[12]** We agree that the primary jurisdiction doctrine requires referral of the threshold issue of the scope of the Waiver Order. Both this court and the Supreme Court have held that the interpretation of an agency order issued pursuant

to the agency's congressionally granted regulatory authority falls within the agency's primary jurisdiction where the order reflects policy concerns or issues requiring uniform resolution. *See*, *e.g.*, *Rilling v. Burlington N. R.R. Co.*, 909 F.2d 399, 401 (9th Cir. 1990) (holding that the resolution of plaintiff's claim required a proper interpretation of an ICC merger order, an issue within ICC's primary jurisdiction); *see also Serv. Storage & Transfer Co. v. Virginia*, 359 U.S. 171, 177 (1959) (holding that the interpretation of a certificate of convenience and necessity issued by ICC to an interstate motor carrier was an issue within the primary jurisdiction of the ICC). These decisions are grounded in the central focus of the primary jurisdiction doctrine, the desirability of uniform determination and administration of federal policy embodied in the agency's orders. *Serv. Storage*, 359 U.S. at 177; *Rilling*, 909 F.2d at 401.

[13] Given this emphasis on achieving uniformity in policy determination and administration, the application of the primary jurisdiction doctrine to the issue of the scope of the FCC's Waiver Order is particularly compelling. The Waiver Order was issued pursuant to the congressional mandate that the FCC regulate the payphone industry and, specifically, that it provide for payphone service providers to receive compensation from interexchange carriers and for incumbent local exchange carriers to eliminate cost subsidies for their payphone systems. Davel observes that the Waiver Order's plain language may be read as open-ended. Opposed to that observation is the argument that, in adopting the Order, the FCC initially contemplated that all local exchange carriers *would* file NST-compliant tariffs within the forty-five-day waiver period. As the current dilemma may not have been contemplated at the outset by the agency, interpreting the Waiver Order requires consideration of policy considerations similar to those that gave rise to the FCC's 1996 and 1997 orders applying the new services test to intrastate payphone rates, as well as to the Waiver Order itself.

More specifically, with the issuance of the Wisconsin Order in 2002, it became apparent that any initial expectation of prompt filing of NST-compliant tariffs may not have been fulfilled. Thus, beyond issues of initial FCC intent, any application of the Order to the several-year period beyond the original forty-five-day waiver term—a several-year period in which the existence of NST-compliant tariffs was uncertain— would raise policy questions not resolved by the Waiver Order itself. Those policy questions include whether applying the refund obligation should depend on whether or not there were good-faith efforts to file compliant rates; whether future enforcement of tariffs will be impeded by allowing ratepayers to complain about noncompliant rates years after the fact; and, conversely, whether a narrow construction of the Waiver Order would reward intentional non-compliance with FCC orders under the 1996 Act.

We cannot say without addressing such policy considerations how the Waiver Order should be applied in the circumstances of this case. How the Waiver Order applies here thus involves questions of policy best left to the FCC, the agency that adopted the Waiver Order in the first place pursuant to its regulatory authority in this arena.

**[14]** In addition, the Waiver Order is national in scope, affecting local exchange carriers and payphone service providers throughout the country, including many industry participants not involved in this litigation. For the Order's reimbursement requirement to be applied uniformly, it is the FCC that must construe its scope. We note that there are currently five requests for such a construction pending before the FCC. The agency has provided some indication that it will determine this issue in due course. *See In re* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Public Notice*, New England Public Communications Council, Inc. Filing of Letter from Supreme Judicial Court of Massachusetts Regarding Implementation of the Pay Telephone Com-

pensation Provisions of the Telecommunications Act of 1996, DA 06-780, 2006 WL 850948 (Apr. 3, 2006), ¶ 1 & n.3; *see also In re* Implementation of the Pay Telephone Reclassification and Compensation Provisions of the Telecommunications Act of 1996, *Public Notice*, Pleading Cycle Established for Michigan Pay Telephone Association Petition for Declaratory Ruling, DA 06-1190, 2006 WL 1519441 (June 2, 2006). It is precisely the purpose of the primary jurisdiction doctrine to avoid the possibility of conflicting rulings by courts and agencies concerning issues within the agency's special competence. At least unless and until the FCC declines to determine the scope of the Waiver Order, questions regarding that scope, including those at the core of this case, are within the agency's primary jurisdiction.[8]

[15] We conclude that the issue of the scope of the Waiver Order should be referred to the FCC.

## C.

If the Waiver Order does entitle Davel to some relief as a result of Qwest's alleged failure to file public access line rates compliant with the new services test by the specified deadline, the pivotal question would become whether Qwest's rates between 1997 and 2002 were NST-compliant. Until we know whether and, if so, to what degree the Waiver Order gives rise to refund relief for all or part of the several year period in which Qwest's rates were assertedly non-NST-compliant, however, we cannot evaluate this refund claim on its merits. Nor, applying our understanding of *Cost Management*, can we determine whether the refund claim is sufficiently fact-dependent that any primary jurisdiction determination must await factual development. Consequently, because we have

---

[8]Whether, as Davel maintains, the FCC could decline to address the scope of its Waiver Order, either expressly or by failing to respond to the outstanding requests, and, if it does, whether the district court could then proceed to do so, are questions we do not decide.

held that the scope of the Waiver Order is within the primary jurisdiction of the FCC, we cannot now address whether the issue of Qwest's pre-2002 rates' compliance with the new services test is also within the agency's primary jurisdiction, and we do not do so.[9]

**D.**

[16] The district court dismissed the case pursuant to the filed rate doctrine. Davel contends that, under the primary jurisdiction doctrine, the appropriate disposition of this case is a stay, not a dismissal. Whether to stay or dismiss without prejudice a case within an administrative agency's primary jurisdiction is a decision within the discretion of the district court. *Reiter*, 507 U.S. at 268-69. The court may stay the case and retain jurisdiction or, "if the parties would not be unfairly disadvantaged, . . . dismiss the case without prejudice." *Id.* The factor most often considered in determining whether a party will be disadvantaged by dismissal without prejudice is whether there is a risk that the statute of limitations may run on the claims pending agency resolution of threshold issues. *Syntek*, 307 F.3d at 782; *Brown*, 277 F.3d at 1173. Also, where the court suspends proceedings to give preliminary deference to an administrative agency but further judicial proceedings are contemplated, then jurisdiction should ordinarily be retained via a stay of proceedings, not relinquished via a dismissal. *N. Cal. Dist. Council of Hod Carriers, Bldg. & Constr. Laborers, AFL-CIO v. Opinski*, 673 F.2d 1074, 1076 (9th Cir. 1982).

---

[9]Qwest also contends that the determination of whether its pre-2002 intrastate public access line rates complied with the new services test is within the primary jurisdiction of the *state* utility commissions, with which, pursuant to the FCC's Order on Recons., those rates are filed. For the same reasons we cannot address whether the issue is within the FCC's primary jurisdiction, we cannot address this contention. We thus do not decide the open question whether primary jurisdiction referral to a state agency would be proper in any event. *See Cost Mgmt.*, 99 F.3d at 949 n.12.

**[17]** Here, because it dismissed the case on the basis of the filed-rate doctrine, the district court did not address whether Davel would be disadvantaged by dismissal. In particular, the district court had no occasion to consider that Davel's claims are subject to a two-year statute of limitations that began to run, at the latest, when Qwest first filed its NST-compliant tariffs, so Davel may well lose its claims before the FCC resolves the threshold issues.

**[18]** We therefore remand to the district court to determine whether to stay the case or dismiss it without prejudice, applying the pertinent factors.

## IV.    Statute of Limitations

The district court dismissed Davel's claims based on Qwest's fraud protection rates as barred by the two-year statute of limitations of 47 U.S.C. § 415(b). Davel contends this dismissal was error because its fraud rate claims did not accrue until Qwest filed NST-compliant fraud protection rates with the FCC in 2003.

The Order on Recons. required the filing of fraud protection tariffs with the FCC by January 15, 1997. *See* Order on Recons. ¶ 163. Davel contends, and Qwest does not dispute, that Qwest filed *no* fraud protection tariffs with the FCC until 2003. During the period between 1997 and 2003, Davel paid Qwest for fraud protection under the rates specified in tariffs Qwest filed with the states. The district court correctly found that, accepting the allegations of the complaint as true, Davel had a cause of action against Qwest as soon as Qwest missed the federal filing deadline and Davel paid for fraud protection services based on the non-compliant rates on file with the state utility commissions. At that time, Davel could have brought any claim it had under 47 U.S.C. §§ 206-207 in district court or with the FCC.

We reject Davel's contention that its cause of action did not accrue until Qwest filed NST-compliant rates in 2003,

because it had no knowledge until then that Qwest's rates were too high. The D.C. Circuit, affirming the FCC, rejected such a contention in similar circumstances in *Sprint Communications Co. v. FCC*, 76 F.3d 1221, 1227-31 (D.C. Cir. 1996) (rejecting application of a "discovery" rule of accrual where cause of action was predicated on "AT & T's failure to file and to charge cost-justified rates"). In that case, the plaintiff, Sprint, argued that it had no knowledge of its claim based on the payment of tariffed rates for telecommunications services until the defendant, AT&T, several years later, filed cost data indicating that the rates charged exceeded lawful levels. *Id.* at 1224-25. Affirming the FCC, the D.C. Circuit held that Sprint was on inquiry notice of the claim as soon as it had knowledge suggesting the rates might be improper. *Id.* at 1229-30.

[19] We find the D.C. Circuit's reasoning on this issue particularly apposite in the circumstances of this case. As soon as Qwest failed to file fraud protection rates with the FCC, it was in technical non-compliance with the Payphone Orders, and Davel was on inquiry notice that it might be paying excessive rates for fraud protection.[10] Its cause of action therefore accrued at that time. The fact that, until Qwest filed its new fraud protection rates in 2003, Davel was not in a position to determine the precise amount of the overcharges, or even whether the charges were excessive at all, does not change this result. "Accrual does not wait until the injured party has access to or constructive knowledge of all the facts required to support its claim. Nor is accrual deferred until the injured party has enough information to calculate its damages." *Sprint*, 76 F.3d at 1229 (citation omitted). Rather,

---

[10]Indeed, as Davel recognizes, the Colorado Public Utilities Commission determined in 1999, based upon a complaint filed in March of 1998, that Qwest's fraud protection rates filed in that state were excessive. *See Colo. Payphone Ass'n v. U.S. West Commc'ns, Inc.*, 1999 WL 632854 (Colo. Pub. Util. Comm'n May 18, 1999). Thus, as in *Sprint*, publicly available information allowed parties similarly situated to Davel to discover their cause of action within a year of the new regulations coming into effect.

"once a plaintiff has [inquiry] notice [of its claim], it bears the responsibility of making diligent inquiries to uncover the remaining facts needed to support the claim." *Id.* at 1230. Once Davel was aware that Qwest had missed the federal filing deadline, it was obliged to make reasonable inquiries to determine any possible injury it may have suffered as a result.[11]

This analysis reflects a key difference between the damages claims concerning the fraud protection services and the claims based on the Waiver Order. On Davel's construction of the Waiver Order, the right to reimbursement under the Order came into existence only upon the filing of NST-compliant rates. On that interpretation, Davel had no right to reimbursement against Qwest until Qwest filed compliant rates, allegedly in 2002, and its cause of action for Qwest's alleged violation of the Waiver Order thus accrued thereafter, when Qwest failed to pay the reimbursements. In contrast, there was no reimbursement order applicable to the fraud protection services, so any cause of action necessarily accrued when Qwest failed to comply with the Payphone Orders and Davel was injured as a result.

[20] Davel's fraud protection services claims are not, however, wholly barred. Qwest's tariff filing obligations were ongoing. Each time Davel paid the non-NST-compliant state-filed tariff, it was injured anew by Qwest's failure to file the required federal tariff. *See MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1101 (3d Cir. 1995) (analogizing to installment contracts and coming to a similar conclusion with respect to 47 U.S.C. § 415(a), the statute of limitations applicable to actions by carriers). Thus, while the district court was correct that the claim for any amounts paid as of May 15, 1997, expired on May 15, 1999, amounts paid

---

[11]We also find it of no moment that this case is before us on a motion to dismiss. Davel's own allegations charge that Qwest missed the federal filing deadline, and there is no reasonable possibility that it can prove that it was not aware of this omission until after 2002.

under non-compliant tariffs within two years prior to the filing of the complaint are timely.

**[21]** Accordingly, we hold that the fraud protection claims based on non-NST-compliant fraud protection rates paid within two years of the filing of Davel's complaint are timely.[12]

## V.  Conclusion

We **REVERSE** the dismissal of Davel's fraud protection claims with respect to fraud protection payments made pursuant to non-NST-compliant rates within the two-year period prior to the filing of the complaint and **REMAND** for further proceedings consistent with this opinion. We **VACATE** the dismissal without prejudice of Davel's Waiver Order claims and **REMAND** the case to the district court for a consideration whether a stay or dismissal without prejudice is the appropriate disposition pursuant to the primary jurisdiction doctrine.

---

[12]Because the parties have raised on appeal no other issues regarding the fraud protection claims, our decision on these claims is limited to the statute of limitations question. Qwest is free to raise other available defenses to these claims on remand.